FILED

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

07 JUN 21  AH 9: 30

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

| | | |
|---|---|---|
| CEDAR FARMS CO., INC. on behalf of itself and all others similarly situated, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | **CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |
| | : | |
| v. | : | 3:07-CV-557-J-33MCR |
| | : | |
| CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, AND KANSAS CITY SOUTHERN RAILWAY COMPANY, | : | |
| | : | |
| Defendants. | : | |

Plaintiff Cedar Farms Co., Inc. ("Cedar Farms" or "Plaintiff"), on behalf of itself and all others similarly situated, by its undersigned attorneys, brings this action for treble damages and injunctive relief, as well as attorneys' fees and costs, under the antitrust laws of the United States against the Defendants named herein based upon personal knowledge as to the paragraph relating to Plaintiff, and upon information and belief as to the other paragraphs, and in connection therewith, alleges:

### NATURE OF THE ACTION

1.      This action is brought as a class action pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of a plaintiff class (the "Class"), defined more fully in Paragraph 16 below, consisting of all persons and entities who purchased unregulated rail freight transportation services from Defendants and their co-conspirators from July 1, 2003 to the present (the "Class Period"), who were assessed a rail fuel surcharge. As used herein, the term "unregulated" refers to rail freight

transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2.    Plaintiff alleges that during the Class Period, defendant railroads conspired to fix, raise, maintain, or stabilize prices of rail freight transportation services sold in the United States through use of rail fuel surcharges added to customers' bills. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Throughout the Class Period, Defendants maintained uniformity of prices in Rail Fuel Surcharges by computing the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices and trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

3.    As a direct and proximate result of this price fixing conspiracy, Defendants have restrained competition in the market for unregulated rail freight transportation services and injured plaintiff and each Class member in their business and property. Plaintiff and the members of the Class each have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

4.    Plaintiff seeks damages on behalf of itself and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

::ODMA\PCDOCS\DOCS\189002\1

## JURISDICTION AND VENUE

5.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C §§ 15, 15(c) and 26, for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs with respect to injuries sustained by Plaintiff and the members of the Class arising from violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1337(a) and 15 U.S.C. § 15(c) and 26.

6.     Venue is proper in this District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391. Defendants maintain offices, have agents, transact business, and are found within this judicial district; a substantial part of the events giving rise to the claims for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

7.     This Court has personal jurisdiction over each Defendant because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PARTIES

8.     Plaintiff Cedar Farms Co. Inc., is a corporation organized under the laws of Pennsylvania with its principal place of business at 2100 Hornig Road, Philadelphia, Pennsylvania 19116. During the Class Period, Cedar Farms purchased unregulated rail freight

::ODMA\PCDOCS\DOCS\189002\1

transportation from one or more of the Defendants and was assessed a Rail Fuel Surcharge, and was injured by reason of the antitrust violations alleged herein.

9.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202.  CSX is a major freight railroad operating primarily in the eastern United States.  CSX Centralized Operations Center, which directs train operations for much of CSX's 21,000 route-mile network, is located in Jacksonville.  CSX maintains major rail yards in this District, with locations in Jacksonville, Tampa and Baldwin.  CSX also maintains locomotive servicing facilities in this District, with locations in Lakeland, Orlando, and Tampa, as well as other facilities in Florida, including in Hialeah, Pensacola and Tallahassee.  Moreover, CSX operates and maintains 1,750 miles of railroad tracks in Florida.

10.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS, a major freight railroad operating primarily in the eastern United States, serves all major eastern ports and connects with rail partners in the West.  NS maintains a bulk distribution facility in Jacksonville, Florida.

11.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation.  BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad.  BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states. BNSF joined forces with CSX to ship products to Florida, South Carolina and Georgia via CSX.

12.    Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105.

13.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP, the largest freight railroad in the United States, serves primarily the western two-thirds of the United States. UP joined with CSX to form "Express Lane", which is used to ship perishable goods from the west coast to the east coast via CSX; one of Express Lane's destinations is Winter Haven, Florida, located within this District.

14.    The United States rail transportation services market was estimated at more than $51 billion in 2006, with Defendants accounting for over 90 percent of all rail shipments during the Class Period.

## CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All purchasers of rail freight transportation services from Defendants (the "Class"), through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint.

17.    The Class is so numerous that joinder of all members thereof is impracticable. Indeed, Plaintiff avers, on information and belief, that during the Class Period thousands of persons and entities located throughout the United States purchased unregulated rail freight transportation as to which Defendants assessed a Rail Fuel Surcharge.

::ODMA\PCDOCS\DOCS\189002\1

18.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members were damaged by the same wrongful conduct of the Defendants as alleged in this Complaint.

19.    Plaintiff will fairly and adequately protect the interests of the Class. The interests of Plaintiff are coincidental with, and not antagonistic to, those of other members of the Class. In addition, Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class actions and antitrust litigation.

20.    There are questions of law and fact common to the members of the Class, and those common questions predominate over any questions which may affect only individual members of the Class, because Defendants have acted on grounds generally applicable to the entire Class. Among the predominant questions of law and fact common to the Class are:

(a)    Whether the Defendants engaged in a combination or conspiracy to raise, fix and maintain Rail Fuel Surcharges applied to unregulated rail freight transportation services in the United States;

(b)    The duration and extent of the combination or conspiracy alleged herein;

(c)    Whether the Defendants were participants in the combination or conspiracy alleged herein;

(d)    Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

(e)    Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the other members of the Class; and

(f)    The appropriate measure of damages sustained by Plaintiff and other members of the Class.

21.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford individually to litigate an antitrust claim such as that asserted herein. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative exits for the fair and efficient adjudication of this controversy on behalf of the members of the Class.

## TRADE AND COMMERCE

22.    The activities of Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

23.    During the time period covered by this Complaint, Defendants sold and carried out rail shipments throughout the United States.

24.    Defendants have used instrumentalities of interstate commerce to carry or sell rail shipments in the United States.

25.    Defendants have sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to customers located in states in the United States.

::ODMA\PCDOCS\DOCS\189002\1

26.     The unlawful activities of Defendants have had direct, substantial, and reasonably foreseeable effect on interstate commerce.

## RAILROAD DEREGULATION

27.     Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980 ("Staggers Act"), in response to concern over the railroad industry's economic condition. The passing of the Staggers Act marked the deregulation of the railroad industry, which caused significant changes in the development of United States railroads.

28.     Prior to the Staggers Act, the Interstate Commerce Commission ("ICC") prohibited railroads from charging rates different from those contained in published tariffs filed by the railroads with the ICC. Today 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

29.     Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, deregulation has, in fact, had the opposite effect. Now shippers are being charged supra-competitive rates by the Defendants.

30.     At the time of the passage of the Staggers Act, there were 35 Class I railroads. Class I railroads are railroad companies that have revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005). Today there are only seven Class I railroads, two of which are owned by Canadian entities. The remaining five Class I railroads, the Defendants named in this action, operate more than 90 percent of all railroad track in the U.S.

## RAILROAD FUEL SURCHARGES

31.     By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa

Fe and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, put a moratorium on new mergers and then promulgated more stringent standards for merger review. At this time, the railroads chose to seize on the rail fuel surcharge as the means to implement their price fixing conspiracy.

32.    Since the passage of the Staggers Act in 1980, railroads increasingly entered into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation. AAR is controlled by the major Class I railroads. In fourth quarter 2002, the AAR published, for the first time, a RCAF without fuel (i.e., a cost escalation index without fuel as a component), in order to remove fuel costs from the RCAF index so that Defendants could begin assessing separate Rail Fuel Surcharges in order to coordinate pricing.

33.    Following publication of the RCAF index without fuel, Defendants began to apply a Rail Fuel Surcharge as a separate item on the shipper's bill. When the price of oil began to rise dramatically in late 2003 and early 2004, Defendants seized the opportunity to increase their revenue substantially. By using monthly changes to the fuel surcharge, Defendants would not have to renegotiate individual contracts or wait for new rail capacity to come on line to meet growing demand. In order for Defendants to profit from this plan, it demanded the cooperation of all of the Defendants.

## THE PRICE FIXING CONSPIRACY

34.    Commencing at least as early as July 2003, Defendants agreed to stop competing with one another with respect to prices they charged rail shippers. The key element of this price fixing conspiracy was an agreement by Defendants to act in concert when computing Rail Fuel

::ODMA\PCDOCS\DOCS\189002\1

Surcharges. To this end, Defendants agreed to compute Rail Fuel Surcharges as a percentage of the base rail freight rate (i.e., revenue), rather than as a percentage of the actual cost of fuel consumption related to the individual shipment to which the surcharge was applied.

35.     The "revenue-based" Rail Fuel Surcharge had no direct relationship to Defendants' actual increase in fuel costs. Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

36.     Defendants implemented this agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases, and posting the monthly fuel surcharge percentages on their websites. Defendants were thus able to monitor and enforce the agreed-upon Rail Fuel Surcharges levels. At the same time, Defendants did not provide to their customers information that would enable the customers to determine the relationship between the Rail Fuel Surcharges and Defendants' unanticipated fuel cost increases.

37.     As a result of this agreement, prices of Rail Fuel Surcharges charged to members of the Class were raised or maintained at super-competitive levels.

38.     On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because there was no relationship between the Rail Fuel Surcharge and the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges,* STB Ex Parte No. 661 (Jan. 25, 2007).

::ODMA\PCDOCS\DOCS\189002\1

## THE EVOLUTION OF THE PRICE FIXING CONSPIRACY

39.    The essential element of Defendants' conspiracy was an agreement to compute Rail Fuel Surcharges not as a cost recovery mechanism for the specific transportation to which it was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation involved. Defendants applied these surcharges not only to published tariff rates, but to private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

40.    Defendants began to implement their conspiracy at least as early as June 2003 when the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices relative to Rail Fuel Surcharges. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index. The BNSF carload fuel surcharge was based on the US Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF"). In or about June 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, the Western Railroads charged the exact same Rail Fuel Surcharge percentage for each month of the Class Period.

41.    The Western Railroads agreed to administer the HDF Index in exactly the same manner. When the U.S. average price of diesel fuel, measured by the HDF Index, equaled or was lower than $1.35 per gallon, Defendants would not apply a surcharge. On the other hand, when the HDF Index exceeded $1.35 per gallon, the Western Railroads applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon.

42.    The Western Railroads synchronized changes to the Rail Fuel Surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. Such increase

::ODMA\PCDOCS\DOCS\189002\1

always occurred on the first day of the month. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

43.    The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF average price had changed. The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

44.    Using the HDF index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

45.    The chart below shows that the Fuel Surcharge percentages charged by the Western Railroads for carload shipments varied before the Class Period began, but were identical starting in July 2003:

### MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0.0% |
| Jul-02 | 1.0% | 0.0% |
| Aug-02 | 0.0% | 0.0% |
| Sep-02 | 0.0% | 0.0% |
| Oct-02 | 1.0% | 0.0% |
| Nov-02 | 2.0% | 0.0% |
| Dec-02 | 2.5% | 0.0% |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |

::ODMA\PCDOCS\DOCS\189002\1

| MONTH | BNSF | UP |
|-------|------|-----|
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |

::ODMA\PCDOCS\DOCS\189002\1

46.    Defendants CSX and NS, located in the east, began to implement the conspiracy in February 2004 or earlier. Shortly thereafter, in June 2005 or earlier, KCS began working in concert with the other Defendants. (Defendants CSX, NS and KCS collectively are the "Eastern Railroads"). The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal.* Indeed, not only did these railroads all agree to use the WTI index (as opposed to many other available indices); once they had joined the conspiracy, they too agreed to administer the index in precisely the same way.

47.    Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. Pursuant to this agreement, Rail Fuel Surcharge rates were increased by 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel.

48.    The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted – thereby adopting the same timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply the exact same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

49.    The choice to use the WTI index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. The fact that Defendants

CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

50.    The result of the conspiracy is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period. Although KCS used different fuel surcharge percentages for certain months of the Class Period, in June 2005 it adopted the same fuel surcharge percentage used by CSX and NS remained consistent with them for the remainder of the Class Period. Moreover, KCS has different operations and fuel consumption patterns from the larger U.S. railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages as the other railroads absent a conspiracy.

51.    The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the class period, but were identical starting in March 2004, and they also were identical to those of the KCS starting in June 2005, when KCS joined the conspiracy.

### MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS | KCS |
|---|---|---|---|
| Aug-03 | 3.2% | 2.0% | |
| Sep-03 | 3.2% | 2.0% | |
| Oct-03 | 3.6% | 2.0% | |
| Nov-03 | 2.4% | 2.0% | |
| Dec-03 | 3.2% | 2.0% | |
| Jan-04 | 3.6% | 2.0% | |
| Feb-04 | 4.0% | 2.0% | |
| Mar-04 | 4.8% | 4.8% | |
| Apr-04 | 4.8% | 4.8% | |
| May-04 | 5.6% | 5.6% | |
| Jun-04 | 5.6% | 5.6% | |
| Jul-04 | 7.2% | 7.2% | |
| Aug-04 | 6.4% | 6.4% | |
| Sep-04 | 7.2% | 7.2% | |
| Oct-04 | 8.8% | 8.8% | |

::ODMA\PCDOCS\DOCS\189002\1

| | | | |
|---|---|---|---|
| Nov-04 | 9.2% | 9.2% | 10.0% |
| Dec-04 | 12.4% | 12.4% | 10.0% |
| Jan-05 | 10.4% | 10.4% | 10.0% |
| Feb-05 | 8.4% | 8.4% | 10.0% |
| Mar-05 | 9.6% | 9.6% | 10.0% |
| Apr-05 | 10.0% | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% | 10.0% |
| Jun-05 | 12.4% | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% | 14.8% |

52.    Despite this uniformity in fuel surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads.  Absent collusion, it is extremely unlikely that Defendants would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years.  The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges.  In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

## ADDITIONAL EVIDENCE OF A CONSPIRACY

53.    Apart from this direct evidence of price fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price fixing conspiracy possible:

a.    The railroad industry is highly concentrated. Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic. Such high concentration facilitates the possibility of a price fixing cartel.

b.    There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These take decades to develop, and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c.    Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

::ODMA\PCDOCS\DOCS\189002\1

d.    The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass 'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e.    The CEO's of Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies). The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

54.    At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Defendants made this switch even though most shippers preferred the former system in order to minimize risk and despite the fact that other methods would increase competition in this industry.

55.    Shippers from many different industries, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

::ODMA\PCDOCS\DOCS\189002\1

56.     Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, Defendants moved to what is known in the industry as "Rule 11 pricing." Rule 11 pricing means that where a shipment requires more than one carrier, each rail carrier in the route creates a bill for its portion of the movement. Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

57.     Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy.

## DEFENDANTS PROFITED FROM THE SURCHARGES

58.     Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

59.     Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during

::ODMA\PCDOCS\DOCS\189002\1

the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## EFFECTS OF THE CONSPIRACY AND INJURY
## TO PLAINTIFF AND TO CLASS

60.    The aforesaid unlawful conduct, combination and conspiracy have had the following effects, among others:

a.    The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels;

b.    Competition in establishing Rail Fuel Surcharges prices for unregulated rail freight was restrained and suppressed; and

c.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition.

61.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by the plaintiff and the Class is the payment of supra-competitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## CAUSE OF ACTION FOR VIOLATION OF § 1 OF
## THE SHERMAN ACT AND § 4 OF THE CLAYTON ACT

62.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

::ODMA\PCDOCS\DOCS\189002\1

63.     Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

64.     The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes *a per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

65.     Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

66.     For the purpose of effectuating the aforesaid combination and conspiracy, the Defendants and their co-conspirators:

   a.     agreed among themselves to fix, raise, maintain and stabilize unregulated rail freight prices;

   b.     agreed among themselves to restrict, restrain, suppress and eliminate competition in the market for rail freight transportation services; and

   c.     agreed among themselves to implement and coordinate increases in the prices charged for rail freight transportation.

::ODMA\PCDOCS\DOCS\189002\1

67.     As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

### RELIEF REQUESTED

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

1.     Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein;

2.     Declaring that the unlawful combination and conspiracy alleged herein be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.     Declaring that Plaintiff and the Class recover treble their damages as caused by the conspiracy alleged herein, as provided by law, and that judgment in favor of Plaintiff and the Class be entered against Defendants in that amount;

4.     That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees and costs, as provided by law; and

5.     That Plaintiff and the Class be granted such other and further relief as the nature of the case may require or as may seem just and proper to this Court.

### DEMAND FOR TRIAL BY JURY

Plaintiff, on its own behalf and on behalf of the proposed class, demands a trial by jury.

::ODMA\PCDOCS\DOCS\189002\1

Respectfully submitted this 20th day of June, 2007.

WILLIAMS SCHIFINO MANGIONE
& STEADY P.A.

By: *Daniel P. Dietrich*

William J. Schifino Jr.
Florida Bar No. 564338
wschifino@wsmslaw.com
Daniel P. Dietrich
Florida Bar No. 934461
ddietrich@wsmslaw.com
One Tampa City Center, Suite 3200
201 North Franklin Street
Tampa, FL 33602
Phone: (813) 221-2626
Fax:    (813) 221-7335

Counsel for Plaintiff

and

**BARRACK, RODOS & BACINE**

Gerald J. Rodos
Mark R. Rosen
Jeffrey B. Gittleman
Beth R. Targan
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Phone: (215) 963-0600

Counsel for Plaintiff

::ODMA\PCDOCS\DOCS\189002\1

MDLOUT

# U.S. District Court
## Middle District of Florida (Jacksonville)
### CIVIL DOCKET FOR CASE #: 3:07-cv-00557-TJC-MCR
#### Internal Use Only

Cedar Farms Co., Inc. v. CSX Transportation, Inc. et al
Assigned to: Judge Timothy J. Corrigan
Referred to: Magistrate Judge Monte C. Richardson
Cause: 15:0015 Antitrust Litigation

Date Filed: 06/21/2007
Date Terminated: 11/21/2007
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Cedar Farms Co., Inc.**
*on behalf of itself and all others
similarly situated*

represented by **Beth R. Targan**
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market St.
Philadelphia, PA 19103
215/963-0600
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Paul Dietrich**
Williams, Schifino, Mangione &
Steady, PA
201 N Franklin St - Ste 2600
PO Box 380
Tampa, FL 33601-0380
813/221-2626
Email: ddietrich@wsmslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gerald Rodos**
Barrack, Rodos & Bacine
3300 Two Commerce Sq.
2001 Market St.
Philadelphia, PA 19103
215/963-0600
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Gittleman**
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market St.
Philadelphia, PA 19103

215/963-0600
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark R. Rosen**
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market St.
Philadelphia, PA 19103
215/963-0600
Fax: 215/963-0838
Email: mrosen@barrack.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Schifino, Jr.**
Williams, Schifino, Mangione &
Steady, P.A.
One Tampa City Ctr., Suite 3200
201 N. Franklin St.
P.O. Box 380
Tampa, FL 33601
813/221-2626
Fax: 813/221/7335
Email: wschifino@wsmslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CSX Transportation, Inc.**    represented by **Kathryn D. Kirmayer**
Crowell & Moring, LLP
1001 Pennsylvania Ave., N.W., 11th
Floor
Washington, DC 20004
202/624-2500
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kent A. Gardiner**
Crowell & Moring, LLP
11th Floor
1001 Pennsylvania Ave NW
Washington, DC 20004
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard McMillan, Jr.**
Crowell & Moring, LLP

1001 Pennsylvania Ave., N.W., 11th
Floor
Washington, DC 20004
202/624-2500
Email: rmcmillan@crowell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BNSF Railway Company**                represented by  **Gary A. Winters**
                                                         Mayer Brown LLP
                                                         1909 K St NW
                                                         Washington, DC 20006-1101
                                                         202/263-3000
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Mark W. Ryan**
                                                         Mayer Brown LLP
                                                         1909 K St NW
                                                         Washington, DC 20006-1101
                                                         202/263-3000
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Richard J. Favretto**
                                                         Mayer Brown LLP
                                                         1909 K St NW
                                                         Washington, DC 20006-1101
                                                         202/263-3000
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Union Pacific Railroad Company**       represented by  **Alan M. Wiseman**
                                                         Howrey, LLP
                                                         1299 Pennsylvania Ave NW
                                                         Washington, DC 20004-2402
                                                         202/783-0800
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Tyrone R. Childress**
                                                         Howrey, LLP
                                                         Suite 1100
                                                         550 S Hope St
                                                         Los Angeles, CA 90071
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Norfolk Southern Railway Company**    represented by **John M. Nannes**
Skadden, Arps, Slate, Meagher & Flom,
LLP
1440 New York Ave NW
Washington, DC 20005
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kansas City Southern Railway
Company**    represented by **Michael S. Gugig**
Sonnenschein Nath & Rosenthal
1221 Avenue of the Americas
New York, NY 10020
212/768-6700
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Reid L. Ashinoff**
Sonnenschein, Nath & Rosenthal, LLP
24th Floor
1221 Avenue of the Americas
New York, NY 10020-1089
212/768-6700
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Dakota Granite Company**    represented by **Douglas A. Millen**
Freed, Kanner, London & Millen, LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015
224/632-4500
Fax: 224/632-4521
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Wozniak**
Freed, Kanner, London & Millen, LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015
224/632-4500
Fax: 224/632-4521
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott W. Carlson**
Heins, Mills & Olson, PLC
3550 IDS Center
80 S 8th St

Minneapolis, MN 55402
612/338-4605
Fax: 612/338-4692
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven A. Kanner**
Freed, Kanner, London & Millen, LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015
224/632-4500
Fax: 224/632-4521
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vincent J. Esades**
Heins, Mills & Olson, PLC
3550 IDS Center
80 S 8th St
Minneapolis, MN 55402
612/338-4605
Fax: 612/338-4692
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**
**McIntrye Group, Ltd.**                    represented by **Douglas A. Millen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Wozniak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott W. Carlson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven A. Kanner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vincent J. Esades**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Dust Pro, Inc.**                                   represented by **Daniel Brockett**
                                                    Quinn, Emanuel, Urquhart, Oliver &
                                                    Hedges, LLP
                                                    10th Floor
                                                    865 S Figueroa St
                                                    Los Angeles, CA 90017
                                                    213/443-3000
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **James E. Cecchi**
                                                    Carella, Byrne, Bain, Gilfillan,
                                                    Cecchi, Stewart & Olstein
                                                    5 Becker Rd.
                                                    Roseland, NJ 07086
                                                    973/994-17900
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Paul Donovan**
                                                    LaRoe, Winn, Moerman & Donovan
                                                    4135 Parkglen Ct. N.W.
                                                    Washington, DC 20007
                                                    202/298-8100
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Richard F. Scruggs**
                                                    Scruggs Law Firm
                                                    120-A courthouse Square
                                                    P.O. Box 1136
                                                    Oxford, MS 38655
                                                    662/281-1212
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Stephen Neuwirth**
                                                    Boies, Schiller & Flexner, LLP
                                                    570 Lexington Ave., 16th Floor
                                                    New York, NY 10022
                                                    212/446-2300
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Interested Party**

**Quality Refractories Installation, Inc.**         represented by **Eugene A. Spector**
                                                    Spector, Roseman & Kodroff, PC
*doing business as*                                 Suite 2500

American Refractory Products

1818 Market St
Philadelphia, PA 19103
215/545-5335
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jay S. Cohen**
Spector, Roseman & Kodroff, PC
Suite 2500
1818 Market St
Philadelphia, PA 19103
215/496-0300
Fax: 215/496-6611
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey A. Brodkin**
Law Office of Jeffrey A. Brodkin, Esq.
Suite 2300
1601 Market St.
Philadelphia, PA 19103
215/567-1234
Fax: 215/569-0809
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Phillip McCarthy**
Law Office of John Phillip McCarthy,
Esq.
217 Bay Ave.
Sommers Point, NJ 08244
609/653-1094
Fax: 609/653-3029
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John C. Murdock**
Murdock Goldenberg Schneider &
Groh, LPA
Suite 600
35 East Seventh St.
Cincinnati, OH 45202
513/345-8291
Fax: 513/345-8294
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Steinberg**
Law Office of Philip A. Steinberg, Esq.
124 Rockland Ave.

Bala Cynwyd, PA 19004
610/664-0972
Fax: 610/664-3101
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theresa Groh**
Murdock Goldenberg Schneider &
Groh, LPA
Suite 600
35 East Seventh St.
Cincinnati, OH 45202
513/345-8291
Fax: 513/345-8294
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William G. Caldes**
Spector, Roseman & Kodroff, PC
Suite 2500
1818 Market St
Philadelphia, PA 19103
215/496-0300
Fax: 215/496-6611
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Nizhnekamskneftekhim USA, Inc.**    represented by **Bernard Persky**
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005
212/907-0700
Fax: 212/818-0477
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. McDonald**
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005
212/907-0700
Fax: 212/818-0477
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James R. Malone**
Chimicles & Tikellis, LLP
One Haverford Centre
361 W Lancaster Ave

Haverford, PA 19041
610/642-8500
Fax: 610/649-3633
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Gottsch**
Chimicles & Tikellis LLP
One Haverford Centre
361 West Lancaster Ave.
Haverford, PA 19041
215/642-8500
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Somerset Industries, Inc.**            represented by **Jan Myer**
Law Offices of Jan Myer & Associates,
PC
1029 Teaneck Rd
Teaneck, NJ 07666
201/862-9500
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mel E. Lifshitz**
Bernstein Liebhard & Lifshitz, LLP
10 E. 40th St., 22nd Floor
New York, NY 10016
212/779-1414
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald J. Aranoff**
Bernstein, Liebhard & Lifshitz, LLP
22nd Floor
10 E 40th St
New York, NY 10016
212/779-1414
Email: aranoff@bernlieb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley D. Bernstein**
Bernstein Liebhard & Lifshitz, LLP
10 E. 40th St., 22nd Floor
New York, NY 10016
212/779-1414
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/21/2007 | 1 | CLASS ACTION COMPLAINT and Demand for Jury Trial against Norfolk Southern Railway Company, Kansas City Southern Railway Company, CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company filed by Cedar Farms Co., Inc. (PAM )(Filing fee $ 350 receipt number J26189) (Entered: 06/21/2007) |
| 06/21/2007 | 2 | AMENDED STANDING ORDER: Filing of documents that exceed twenty-five pages. Signed by All Divisional Judges on 5/25/2005. (PAM ) Modified on 6/21/2007 (PAM ). (Entered: 06/21/2007) |
| 06/21/2007 |  | (Court only) ***COPIES mailed to Gerald Rodos, Jeffrey B. Gittleman and Beth R. Targan re 2 Amended Standing Order re: 25 pages (PAM ) (Entered: 06/21/2007) |
| 06/21/2007 |  | Summons issued as to Kansas City Southern Railway Company, CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company. (PAM ) (Entered: 06/21/2007) |
| 06/26/2007 | 3 | NOTICE of filing copy of motion to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Cedar Farms Co., Inc., (PAM ) (Titled motion of plaintiff Cedar Farms Co., Inc. for transfer of related actions to the U.S. District Court for the Middle District of Florida for coordination or consolidated pretrial proceedings pursuant to 28 U.S.C. 1407) (Entered: 06/27/2007) |
| 06/26/2007 | 4 | Memorandum of Plaintiff Cedar Farm Co., Inc. in Support of 3 NOTICE of filing copy of motion to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Cedar Farms Co., Inc., (PAM ) (Titled motion of plaintiff Cedar Farms Co., Inc. for transfer of related actions to the U.S. District Court for the Middle District of Florida for coordination or consolidated pretrial proceedings pursuant to 28 U.S.C. 1407) filed by Cedar Farms Co., Inc. (PAM ) (Exhibits 1 to 11 filed separately) (Entered: 06/27/2007) |
| 06/26/2007 | 5 | NOTICE of filing copy of notice of related action in re: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Cedar Farms Co. Inc. (PAM) (Entered: 06/27/2007) |
| 06/26/2007 | 6 | NOTICE of filing copy of interested party in re: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Cedar Farms Co., Inc. (PAM ) (Titled response of interested party plaintiff Cedar Farms Co., Inc. to motion of Dust Pro. Inc. for transfer of related actions for coordination or consolidated pretrial proceedings pursuant to 28 U.S. 1407) (Entered: 06/27/2007) |
| 06/26/2007 | 7 | CERTIFICATE OF SERVICE by Cedar Farms Co., Inc. re 3 NOTICE of filing copy of motion to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Cedar Farms Co., Inc., 4 Memorandum of Plaintiff Cedar Farm Co., Inc. in Support of 3 NOTICE of filing copy of |

| | | |
|---|---|---|
| | | motion to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Cedar Farms Co., Inc., 5 NOTICE of filing copy of notice of related action in re: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Cedar Farms Co. Inc. and 6 NOTICE of filing copy of interested party in re: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule by Cedar Farms Co., Inc. (PAM ) (Entered: 06/27/2007) |
| 06/26/2007 | 9 | NOTICE of filing copy of cross-motion to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Dakota Granite Company, McIntrye Group, Ltd. (PAM ) (Titled Cross-Motion by Plaintiffs Dakota Granite Company and McIntrye Group, Ltd. for transfer and consolidation of related antitrust actions to the District of Columbia pursuant to 28: U.S.C. 1407) Modified on 7/2/2007 to correct text (PAM ). (Entered: 07/02/2007) |
| 06/26/2007 | 10 | NOTICE of filing copy of memorandum of law in support of cross motion as to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Dakota Granite Company, McIntrye Group, Ltd. re 9 Notice (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G)(PAM ) (Titled memorandum of law in support of cross-motion by plaintiffs Dakota Granite Company and McIntrye Group, Ltd. for transfer and consolidation of related antitrust actions to the District of Columbia pursuant to 28 U.S.C. 1407) (Entered: 07/02/2007) |
| 06/26/2007 | 11 | Schedule of actions by Dakota Granite Company, McIntrye Group, Ltd. re 9 Notice of filing and 10 Notice of filing (PAM ) (Exhibits not scanned) (Entered: 07/02/2007) |
| 06/26/2007 | 12 | CERTIFICATE OF SERVICE by Dakota Granite Company, McIntrye Group, Ltd. re 9 Notice of filing, 10 Notice of filing and 11 Schedule of actions(PAM ) (Entered: 07/02/2007) |
| 06/28/2007 | 8 | NOTICE of designation under Local Rule 3.05 - track 3. Signed by Deputy Clerk on 6/28/2007. (md) (Entered: 06/28/2007) |
| 06/29/2007 | 9 | (Court only) ***COPIES mailed to Jeffrey B. Gittleman, Esquire, Gerald Rodos, Esquire and Beth R. Targan, Esquire re 8 Related case order and notice of designation of track 3 (PAM ) (Entered: 06/29/2007) |
| 07/02/2007 | 13 | NOTICE of filing copy of response to motion as to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by by Norfolk Southern Railway Company, Kansas City Southern Railway Company, CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company (PAM ) (Titled: Railroad defendants' response to plaintiff Dust Pro, Inc. motion for transfer of related actions for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. 1407) Modified on 7/3/2007 (PAM ). (Entered: 07/03/2007) |
| 07/02/2007 | 14 | NOTICE of filing copy of reasons why oral argument should be heard in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by by Norfolk Southern Railway Company, Kansas City Southern Railway Company, CSX Transportation, Inc., BNSF Railway Company, Union |

| | | |
|---|---|---|
| | | Pacific Railroad Company re 13 Notice (PAM ) (Entered: 07/03/2007) |
| 07/02/2007 | 15 | NOTICE of filing notice of related actions in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Norfolk Southern Railway Company, Kansas City Southern Railway Company, CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company re 13 Notice (PAM ) (Entered: 07/03/2007) |
| 07/02/2007 | 16 | Notice of filing copy of Proof of service as to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by by Norfolk Southern Railway Company, Kansas City Southern Railway Company, CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company (PAM ) (Entered: 07/03/2007) |
| 07/02/2007 | 17 | NOTICE of filing copy of proof of service as to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by PROOF of service by Norfolk Southern Railway Company, Kansas City Southern Railway Company, CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company (PAM ) (Entered: 07/03/2007) |
| 07/02/2007 | 18 | SUPPLEMENTAL CERTIFICATE OF SERVICE by Dakota Granite Company re 9 Notice, ( 10 Notice, 12 Certificate of Service (PAM ) (Entered: 07/03/2007) |
| 07/03/2007 | | (Court only) ***Attorney Vincent J. Esades, Scott W. Carlson, Steven A. Kanner, Douglas A. Millen, and Robert J. Wozniak for Dakota Granite Company, McIntrye Group, Ltd. added. (sms) (Entered: 07/03/2007) |
| 07/05/2007 | 19 | STIPULATION *and Agreed Order* by Norfolk Southern Railway Company, Kansas City Southern Railway Company, Cedar Farms Co., Inc., CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company. (Dietrich, Daniel) (Entered: 07/05/2007) |
| 07/05/2007 | 21 | Remark: Copy of Reply Memorandum in Support of Plaintiff Dust Pro, Inc's Motion for Transfer of Related Actions for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. 1407. Original pleading sent to MDL Panel (Attachments: # 1 Exhibit A# 2 Exhibit B) (JMAP, ) (Entered: 07/06/2007) |
| 07/05/2007 | 22 | Remark: Copy of Certificate of Service filed. Original pleading sent to MDL Panel. (JMAP, ) (Entered: 07/06/2007) |
| 07/06/2007 | 20 | ORDER re 19 Stipulation. Signed by Judge Timothy J. Corrigan on 7/6/2007. (SRW) (Entered: 07/06/2007) |
| 07/09/2007 | | (Court only) ***COPIES mailed to Counsel: Reid L. Ashinoff, Scott W. Carlson, Vincent J. Esades, Jeffrey B. Gittleman, Michael S. Gugig, Steven A. Kanner, Douglas A. Millen, Gerald Rodos, Beth R. Targan, Robert J. Wozniak; re 20 Order (JLM, ) (Entered: 07/09/2007) |
| 07/09/2007 | | (Court only) ***Attorney Alan M. Wiseman and Tyrone R. Childress for Union Pacific Railroad Company; John M. Nannes for Norfolk Southern Railway Company; Richard J. Favretto, Mark W. Ryan and Gary A. Winters for BNSF Railway Company; Richard McMillan, Jr., Kent A. |

| | | |
|---|---|---|
| | | Gardiner and Kathryn D. Kirmayer for CSX Transportation, Inc. added. (sms) (Entered: 07/09/2007) |
| 07/09/2007 | | (Court only) ***Attorney Daniel Brockett, James E. Cecchi and Paul Donovan for Dust Pro, Inc. added. (sms) (Entered: 07/09/2007) |
| 07/10/2007 | | Summons issued as to Norfolk Southern Railway Company. (PAM ) (Entered: 07/10/2007) |
| 07/19/2007 | 23 | NOTICE of filing notice of related actions in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule by Quality Refractories Installation, Inc. (PAM )(Titled cross motion....) (Entered: 07/20/2007) |
| 07/19/2007 | 24 | NOTICE filing copy of memorandum of law in support of cross motion as to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule by Quality Refractories Installation, Inc. re 23 Notice (PAM ) (Titled memorandum of law in support of cross-motion...) (Entered: 07/20/2007) |
| 07/19/2007 | 25 | Proof of Service by Quality Refractories Installation, Inc. re 23 NOTICE of filing notice of related actions in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule and 24 NOTICE filing copy of memorandum of law in support of cross motion as to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule (PAM ) (Entered: 07/20/2007) |
| 07/23/2007 | 26 | NOTICE of filing corrected memorandum of law in support of cross-motion of plaintiff Quality Refractories Installation, Inc. for tranfer related actions to the U.S. District Court for the Eastern Division of Pennsylvania for coordination or consolidated pretrial proceedings pursuant to 28 U.S.C. 1407 24 NOTICE filing copy of memorandum of law in support of cross motion as to transfer in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule by Quality Refractories Installation, Inc.(PAM ) (Entered: 07/24/2007) |
| 07/23/2007 | 27 | NOTICE of filing response to all motions for consolidation and transfer and in further support of its motion for consolidation and transfer to the Middle District of Florida in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Cedar Farms Co., Inc. (PAM ) (Entered: 07/24/2007) |
| 07/23/2007 | 28 | NOTICE of filing interested party response of plaintiff for transfer of actions to the Eastern District of Pennsylvania pursuant to 28 U.S.C. 1407 for coordinated or consolidated pretrial proceedings in RE: MDL 1869 pursuant to Rule 5.12 (c) of the MDL Rule filed by Nizhnekamskneftekhim USA, Inc. (PAM ) (Entered: 07/24/2007) |
| 07/23/2007 | 29 | Proof of Service by Nizhnekamskneftekhim USA, Inc. re 28 Interested Party Response (PAM ) (Entered: 07/24/2007) |
| 07/24/2007 | | (Court only) ***Attorney James R. Malone for Nizhnekamskneftekhim USA, Inc., Michael D. Gottsch for Nizhnekamskneftekhim USA, Inc. added. (PAM ) (Entered: 07/24/2007) |
| 08/08/2007 | 30 | Notice of filing Somerset Industries, Inc. memorandum of law in |

| | | |
|---|---|---|
| | | opposition to Movant's Quality Refractories Installation, Inc. d/b/a American Refractory Products, Request for transfer and consolidation of related antitrust actions to the Eastern District of Pennsylvania and in further support of Movant, Dust Pro, Inc.'s motion for transfer and consolidation pursuant to 28 U.S.C. 1407. (PAM) (Entered: 08/08/2007) |
| 11/21/2007 | 31 | MULTI-DISTRICT LITIGATION panel order transferring case to: U.S. District Court for the District of Columbia, Washington, D.C. Transferee court case number: CA No. 1-07-2064 MDL case number: 1869 (PAM) (Entered: 11/26/2007) |
| 11/26/2007 | | (Court only) ***COPIES mailed to Reid L. Ashinoff, Stanley D. Bernstein, Daniel Brockett, Jeffrey A. Brodkin, William G. Caldes, Scott W. Carlson, James E. Cecchi, Tyrone R. Childress, Jay S. Cohen, Paul Donovan, Vincent J. Esades, Richard J. Favretto, Kent A. Gardiner, Jeffrey B. Gittleman, Michael D. Gottsch, Theresa Groh, Michael S. Gugig, Steven A. Kanner, Kathryn D. Kirmayer, Mel E. Lifshitz, James R. Malone, John Phillip McCarthy, Christopher J. McDonald, Douglas A. Millen, John C. Murdock, Jan Myer, John M. Nannes, Stephen Neuwirth, Bernard Persky, Gerald Rodos, Mark W. Ryan, Richard F. Scruggs, Eugene A. Spector, Philip A. Steinberg, Beth R. Targan, Gary A. Winters, Alan M. Wiseman, Robert J. Wozniak, re 31 Multidistrict litigation out (PAM) (Entered: 11/26/2007) |
| 11/26/2007 | | (Court only) Forwarded via email complaint, docket sheet, MDL order and CM/ECF Instructions for internal court use to U.S. District Court for the District of Columbia re 31 Multi-district litigation out (PAM) (Entered: 11/26/2007) |